UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMAAL THOMAS,<br><br>  Plaintiff,<br><br>  v.<br><br>CHAD DARLING, et al.,<br><br>  Defendants. | No. 2:16-02691 JAM CKD P<br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding pro se in this civil rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendants Darling, Pizzaro, Camp, and Haring, all correctional officers at California State Prison-Sacramento ("CSP-Sac"), violated his Eighth Amendment rights through their use of excessive force as well as their deliberate indifference to his serious medical needs on September 24, 2015. See ECF Nos. 1 (Complaint), 7 (Screening Order). Currently pending before the court is a motion for summary judgment filed by defendants Camp, Haring, and Pizarro. ECF No. 44. The motion has been fully briefed by the parties. See ECF Nos. 58, 61. Defendant Darling, who is represented by separate counsel, has not filed a motion for summary judgment. For the reasons that follow, the undersigned recommends granting the motion for summary judgment.

## I. Allegations in the Complaint[1]

On September 24, 2015, while throwing a football with other inmates on the C-Facility exercise yard at CSP-Sac, plaintiff began "to feel dizzy and experience symptoms of a syncopal episode." ECF No. 1 at 9. At approximately the same time, there was an incident near the basketball courts that caused all the inmates on the yard to be ordered to sit down. Id. at 10. "Due to plaintiff's dizzy spells and being concerned for his own safety plaintiff was a little bit slower than other inmates to sit down…." Id. Defendant Darling then "blind sided" plaintiff by hitting him in the left arm, chest, head, ankle, and shoulder which caused plaintiff to fall to the ground. Id. Defendant Darling then stepped on plaintiff "purposely digging the cleats of his boots into Thomas's left arm tearing the flesh and causing severe wanton pain." Id. Defendant Darling then proceeded running to the incident on the basketball courts. Id.

A short time later, defendant Darling together with defendants Pizarro, Camp, and Haring approached plaintiff who was sitting in the grassy area of the exercise yard. ECF No. 1 at 11. Defendants had their pepper spray bottles and batons in hand. Id. Plaintiff stood up "in fear of being assaulted again by [defendant] Darling and the accompanying officers. Id. at 12. He also told the officers about his need for medical care based on his "syncopal symptoms and the pain from being assaulted by C/O Darling." Id. Plaintiff "attempted to comply with being [hand]cuffed…," but as soon as he mentioned filing a grievance against the officers, defendant Darling pepper sprayed plaintiff in the eyes and face. ECF No. 1 at 13. "This blinded Thomas immediately." Id. A riot between several inmates and the defendant officers then ensued. Id.

Plaintiff was ultimately placed in plastic zip ties by an unidentified correctional officer and escorted off the exercise yard. ECF No. 1 at 13. Plaintiff was not provided with medical care for his bloody arm and ankle or his pain in his eyes and chest until four hours later. Id. at 13-14.

Plaintiff alleges that defendants Haring, Pizarro, and Camp failed to protect him from Darling's use of excessive force. ECF No. 1 at 17. He also alleges that all the defendants were

---

[1] The allegations in the complaint may be construed as an affidavit in opposition to summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure when they are made under penalty of perjury. See Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995).

deliberately indifferent to his serious medical needs when they ignored his requests for treatment for his dizziness, syncope, and pain resulting from defendant Darling's assaults. Id. at 18-19.

## II. Motion for Summary Judgment

Defendants' motion asserts that there is no genuine issue of material fact in dispute establishing that they were deliberately indifferent to threats to plaintiff's safety. ECF No. 44 at 12-15. Secondly, defendants argue that there is no evidence that they were deliberately indifferent to plaintiff's serious medical needs. Id. at 16-19. As an additional basis to grant summary judgment, defendants contend that they are entitled to qualified immunity because no violation of plaintiff's constitutional rights occurred. Id. at 20.

After being afforded an extension of time, plaintiff submitted an opposition to defendants' summary judgment motion on January 28, 2019. ECF No. 58. Plaintiff contends that defendants failed to diffuse the situation or to intervene when defendant Darling approached plaintiff a second time armed with pepper spray and yelling racial insults. Id. at 10. Plaintiff further argues that all of the defendants conspired with one another to violate his constitutional rights. "Defendants Pizarro, Camp, and Haring acted in concert when they encouraged and participated with Darling in using degrading, racists [sic], and vulgar language toward Plaintiff and surrounding inmates, knowingly inciting violence which placed Plaintiff's life in immediate harm and/or at risk of being assaulted." Id. at 4. In his opposition, plaintiff does not limit his deliberate indifference claim to his serious heart condition, but also "other serious medical conditions" including his injury from defendant Darling's initial use of excessive force. ECF No. 58 at 16.

By way of reply, defendants first point out that plaintiff's opposition was filed beyond the extended deadline granted by the court even with the benefit of the prison mailbox rule.[2] ECF No. 61 at 3-4. Next, defendants assert that plaintiff expanded his theory of liability on the medical indifference claim from his original heart-related syncope episode described in his complaint. Id. at 6. With respect to the failure to protect plaintiff from Darling's use of pepper

---

[2] In light of plaintiff's pro se status as well as the voluminous amount of records and declarations submitted with his opposition which are not easy for a prisoner to obtain, the court will not strike plaintiff's opposition on the basis that it was filed two days late.

3

spray, defendants highlight the lack of any admissible evidence from which a rational jury could find that they were subjectively aware of any risk to plaintiff's safety. Id. at 7-8. "Plaintiff's speculation about what Defendants may have known is not enough to create a material dispute of fact" to survive summary judgment. Id. at 8. Even accepting plaintiff's statement that he told defendants of his medical symptoms and Darling's initial use of force against him, there was not sufficient time nor opportunity for defendants to intervene in light of the other inmates on the exercise yard who attacked defendants. Id. at 8-9. Lastly, regarding the allegations that defendants' words and insults provoked the prison riot, defendants once again assert that this did not increase any risk of harm to plaintiff. Id. "[T]heir alleged actions would only expose themselves to the risk of being harmed by the inmates who were insulted or threatened." Id. For all these reasons, defendants request the court to grant their summary judgment motion.

### III. Evidentiary Objections

In addition to their reply, defendants filed objections to plaintiff's exhibits in opposition to summary judgment. ECF No. 61-1. Defendants challenge the majority of the medical records plaintiff attached to his opposition on the basis that they are not relevant to the events of September 24, 2015, they contain inadmissible hearsay, and lack a proper foundation. Id. at 5. Defendants also move to strike portions of plaintiff's affidavit that contains his lay opinion and speculation about Dr. Moghaddam's review of his medical chart. Id.

It is not the practice of this court to rule on evidentiary matters individually in the context of summary judgment. Accordingly, to the extent the court necessarily relied on evidence that has been objected to, the court relied only on evidence it considered to be admissible. See Fed. R. Civ. P. 56(c)(4); see also Block v. City of Los Angeles, 253 F.3d 410, 419 (9th Cir. 2001) (holding that it was an abuse of discretion for the district court, at the summary judgment stage, to consider information from an affidavit based on inadmissible hearsay rather than the affiant's personal knowledge).

/////

/////

/////

### IV. Facts[3]

On September 24, 2015, plaintiff was a CDCR inmate incarcerated at CSP-Sacramento. Defendants' Statement of Undisputed Facts ("DSUF") at ¶ 1-2. Defendants Pizarro, Camp and Darling were all employed at CSP-Sac as Correctional Officers. DSUF at ¶ 3-5. Defendant Haring was employed as a Correctional Sergeant at CSP-Sac. DSUF at ¶ 6.

CSP-Sacramento consists of four separate facilities: Facility A, Facility B, Facility C, and a Short-Term Restricted Housing unit. DSUF at ¶ 7. There are separate open-air recreational yards for Facility A, B, and C. DSUF at ¶ 8. Each recreational yard is monitored by Pelco security cameras. DSUF at ¶ 9. The yard security cameras recorded the events that took place on the Facility C exercise yard on September 24, 2015 from approximately 10:09 a.m. to 10:29 a.m. DSUF at ¶ 10. This security camera footage was saved in an encrypted video file format that cannot be tampered with or converted into another video file format. DSUF at ¶ 11. The security camera footage contains no audio. ECF No. 45. The authenticity of the video is undisputed.

An inmate stabbing and fight occurred near the upper basketball court on the exercise yard of Facility C prior to the events at issue in the present lawsuit. DSUF at ¶ 12; see also C Yard Cam 8 at 10:09:40-10:10:10. The stabbing prompted custody staff to order all of the inmates on the recreational yard to get down and called for a "Code One" staff response. DSUF at ¶ 13. During a Code One response, staff members who are designated "Code One" will respond to the security incident, while staff members who are designated "Code Two" will prepare to assist the "Code One" responders if necessary. DSUF at ¶ 14.

Defendants Pizarro, Haring, and Camp were among the correctional officers who responded to the Code One at the upper basketball court. DSUF at ¶ 15. While in the area of the upper basketball court, defendant Darling informed defendant Haring that he had used force on an inmate in the exercise yard who refused to get down during the alarm. DSUF at ¶ 16. That inmate was identified as plaintiff. ECF No. 44-6 at 2 (Haring Declaration); ECF No. 44-7 at 2 (Pizarro Declaration); ECF No. 44-8 at 2 (Camp Declaration). Defendant Haring then ordered

---
[3] All facts are undisputed unless otherwise indicated.

5

Pizarro and Camp to assist with taking plaintiff into custody. DSUF at ¶ 17. Defendants did not know at that time and had no reason to believe that defendant Darling had previously used excessive force as described in the complaint against plaintiff. DSUF at ¶ 18.

At approximately 10:16 a.m., Haring, Camp, Pizarro, and Darling walked from the upper basketball court to the lower soccer field where plaintiff was seated. DSUF at ¶ 19; C Yard PTZ 7 at 10:16:48-10:18:05; C Yard Cam 8 at 10:16:47-10:18:05. Defendant Darling was the officer who approached plaintiff first, followed by Camp and Pizarro, and then defendant Haring. DSUF at ¶ 23. What happened next is disputed between the parties.

### A. Defendants' Version of the Use of Force

Defendants contend that plaintiff stood up from a seated or crouched position as all four officers approached. ECF No. 44-6 at 2; ECF No. 44-7 at 2; ECF No. 44-8 at 2; C Yard PTZ 7 at 10:18:00-10:18:05; C Yard Cam 8 at 10:18:00-10:18:05. At about the same time, another inmate in the vicinity by the name of Sullivan, stood up from a seated position and began to speak to nearby inmates. ECF No. 4407 at 3; see also C Yard PTZ 8 at 10:17:48. Defendant Pizarro does not remember what Inmate Sullivan said specifically, but he believed that it was an effort to antagonize or "rile up the other inmates" on the yard. ECF No. 44-7 at 3. Pizarro ordered Inmate Sullivan to sit back down several times. ECF No. 44-7 at 3. However, he remained in a crouched position. ECF No. 44-7 at 3; C Yard PTZ 7 at 10:17:48-10:18:12; C Yard Cam 8 at 10:17:48-10:18:23. Defendants Camp and Haring noticed that other inmates in the same area, including Inmate Wilson, were also in a squatting position when they should have been completely seated. ECF No. 44-6 at 2; ECF No. 44-8 at 2. Defendants Camp and Haring ordered these inmates to sit back down on the ground. ECF No. 44-6 at 2; ECF No. 44-8 at 2. Defendant Haring called for a Code Two response once these inmates refused to obey these orders. DSUF at ¶ 26. A Code Two response indicates that Code One staff members are experiencing a situation that they cannot handle by themselves. DSUF at ¶ 27.

Defendant Pizarro noticed that plaintiff then took "a bladed or fighting stance." ECF No. 44-7 at 3. Multiple inmates then rose to their feet and ran towards the four defendants. ECF No. 44-6 at 2; ECF No. 44-7 at 3; see also C Yard PTZ 7 at 10:18:22-10:18:25; C Yard Cam 8 at

6

10:18:24-10:18:35. According to Pizarro, plaintiff charged at defendant Darling and tackled him to the ground. ECF No. 44-7 at 3; C Yard PTZ 7 at 10:18:26-10:18:30; C Yard Cam 8 at 10:18:28-10:18:30.

Inmate Wilson charged defendants Pizarro and Camp who both deployed their pepper spray towards him. ECF No. 44-7 at 3; ECF No. 44-8 at 2. Inmate Wilson ran into defendant Camp who was knocked to the ground. ECF No. 44-7 at 3; ECF No. 44-8 at 2. Defendant Camp was "hit and kicked multiple times" while on the ground and "inadvertently exposed to pepper spray during this attack." ECF No. 44-8 at 2. The only two officers who remained standing, Haring and Pizarro, were the individuals who deployed their pepper spray canisters on the attacking inmates. ECF No. 44-6 at 2; ECF No. 44-7 at 4. One unidentified inmate "pushed through the bursts of pepper spray" and punched defendant Haring on the right side of the face. ECF No. 44-6 at 2.

Defendant Pizarro observed plaintiff get on top of defendant Darling and punch him multiple times. ECF No. 44-7 at 3-4. He then noticed Inmates Sullivan, Ziegler, and Bellows punching defendant Darling while he was on the ground. ECF No. 44-7 at 4. Inmates Sullivan and Ziegler retreated in response to the pepper spray. Plaintiff and Inmate Bellows retreated after they were struck with a baton by defendant Pizarro. ECF No. 44-7 at 4.

### B. Plaintiff's Version of the Use of Force

Plaintiff denies ever taking a bladed or fighting stance as the defendants approached him. Id. at ¶ 16. Plaintiff does admit standing up, but only "in response to Darling's threats directed to me of bringing further physical harm to me…." Id. at ¶ 17. According to plaintiff, he never charged or tackled defendant Darling. Id. at ¶ 21. Instead, he "blindly" ran into Darling and tripped over him after he was pepper sprayed in the face and eyes. Id. at ¶ 22-23; see also C Yard Cam 8 at 10:18:26 (plaintiff pepper sprayed by defendant Darling). Plaintiff was then hit in the head and back "by what felt like a fist," but was actually defendant Pizarro's baton. Id. at ¶ 23, 26.

Plaintiff also submitted sworn declarations from five other inmates who were located at

7

various parts of the exercise yard during the events at issue. See ECF No. 58 at 97-114.[4] These inmates averred that defendants approached plaintiff using vulgar language and that defendants Pizarro and Darling approached while shaking their pepper spray canisters. See ECF No. 58 at 105-106, ¶¶ 5, 7; ECF No. 58 at 97, 99; ECF No. 58 at 101, 204.

The parties agree that security Code Two responders arrived on scene after all of the events in dispute occurred. DSUF at ¶ 36. Defendants Haring and Camp were escorted off of the exercise yard to receive medical treatment. DSUF at ¶ 39. Plaintiff was taken into custody by an unidentified correctional officer. DSUF at ¶ 40.

Plaintiff points out that even though he was issued a rules violation report (CDC-115) and criminally charged in the Sacramento County Superior Court for the events that occurred on September 24, 2015, these were both dismissed. ECF No. 58 at ¶ 20.

The security camera evidence shows that the entire encounter between plaintiff and defendants on the soccer field transpired very rapidly during an approximate 35-43 second period of time. See C Yard PTZ 7 at 10:18:05-10:18:40; C Yard Cam 8 at 10:18:05-10:18:48. Due to the distance between the security cameras and the actual incident on the soccer field, however, the security camera footage is not dispositive of who did what to whom once multiple inmates stood up and approached defendants Darling, Haring, Camp, and Pizarro.

### C. Facts Relevant to Plaintiff's Medical Condition

In his affidavit, plaintiff states that after he was initially struck by defendant Darling, he "continued to have chest pains, trouble breathing, blurred vision, trouble standing… and [was] constantly hunch[ed] over gasping for air while suffering from severe pain…." ECF No. 58 at ¶ 35; see also C Yard PTZ 4 at 10:14:00-10:15:45. Plaintiff also submitted a Health Care Services Request Form that he completed on September 25, 2015 complaining of joint pain in his left arm with bruises and dried up blood. ECF No. 58 at 80. As a result of this request form, plaintiff was seen by Registered Nurse D. Russell on September 28, 2015 who noted an abrasion to the "inner aspect" of plaintiff's elbow. ECF No. 58 at 82. Plaintiff's Medtronic cardiac remote monitor was

---

[4] The majority of these declarations concern the events that transpired between plaintiff and defendant Darling which are not at issue in the present motion.

also "pulled from property and returned" on this same day. ECF No. 58 at 80.

Plaintiff's CDCR medical records from May 2015 through February 2016 were reviewed by Dr. Moghaddam, a California Correctional Health Care Services Physician. DSUF at ¶¶ 44-45.

Dr. Moghaddam described syncope, or fainting, as a sudden loss of consciousness that occurs when the brain does not receive enough blood or oxygen. DSUF at ¶ 46. Prior to losing consciousness, an individual can experience dizziness, muscular weakness, nausea, heart palpitations, or lightheadedness. Id. There are many possible causes for syncope including dehydration, physical exertion, emotional distress, or a medical condition that affects the heart, blood vessels, lungs, or central nervous system. Id. Syncope is not necessarily dangerous, but it may indicate that a person has a more serious medical condition. Id.

Based on his medical practice, Dr. Moghaddam is also familiar with loop recorders that are implanted underneath a patient's skin in order to continuously monitor the patient's heart rhythm. DSUF at ¶ 47. A loop recorder automatically detects and logs any abnormal heart rhythm, or arrhythmia, that a patient experiences. Id. This medical device cannot regulate a patient's heart rate or mitigate any heart conditions that a patient may experience. Id. "Loop recorders are very accurate at detecting and recording heart arrhythmias, and doctors primarily use loop recorders to determine if a patient suffers from a heart-related medical condition." Id. Plaintiff had a loop recorder implanted based on his reported syncope and near-syncopal episodes. DSUF at ¶ 50. On August 13, 2015, plaintiff's loop recorder was checked and showed evidence of pauses, the longest being 3.6 seconds, that all occurred during the early morning hours. Id.

Dr. Moghaddam examined plaintiff on October 2, 2015 for a follow-up visit for his cardiac complaints. DSUF at ¶ 48-49. During this examination, plaintiff reported that he experienced "near syncnope" and dizziness on September 24, 2015. DSUF at ¶ 49. Plaintiff reported that he did not pass out, and that after he sat down for three minutes he "was okay." Id. According to Dr. Moghaddam, plaintiff did not indicate experiencing an accelerated heart beat, palpitations, chest pain, shortness of breath, blurred vision, heavy fatigue, or pain caused by his

near syncope on September 24, 2015. ECF No. 4404 at 3, ¶ 10.

     Dr. Moghaddam also reviewed a Transfer Summary from San Joaquin General Hospital dated November 13, 2015 indicating that plaintiff's bradycardia, or abnormally slow heart rate, may have been caused by obstructive sleep apnea. DSUF at ¶ 51. This medical record reflects that plaintiff "is asymptomatic and not complaining of any dizziness" when he is awake. Id.

     Plaintiff's loop recorder data was also reviewed on November 12, 2015 while plaintiff was at San Joaquin General Hospital. DSUF ¶ 52. This data showed that plaintiff experienced 3.5 to 4 second pauses while he was asleep. Id. "The record reflects that inmate Thomas's reported syncope and presyncope events occurred during the day and were not correlated with any underlying cardiac arrhythmias." ECF No. 4404 at 5, ¶ 15. Dr. Moghaddam also reviewed an "Episode List" of all of plaintiff's arrhythmias recorded on his loop recorder between August 13, 2015 through November 12, 2015. ECF No. 44-4 at 5, ¶ 16. Based on this report, there is no medical evidence that plaintiff experienced any heart palpitations or arrhythmias on September 24, 2015. Id.

     In Dr. Moghaddam's review of plaintiff's medical records, he found nothing that identified a medical cause for the reported syncope or presyncope episodes. DSUF at ¶ 55. Dr. Moghaddam did not find any medical evidence demonstrating that plaintiff suffered from any heart problem or heart condition on September 24, 2015. Id. Nor was there any medical evidence that plaintiff suffered any injury related to not having an external device or heart monitor for his loop recorder. Id. In Dr. Moghaddam's professional opinion, plaintiff's claim of experiencing syncope symptoms caused by an underlying heart condition on September 24, 2015 is contradicted by his medical records. ECF No. 44-4 at 5, ¶ 18.

     According to defendants, they were not aware that plaintiff was experiencing any medical issue or suffering from a medical condition for which he needed attention during their entire encounter. ECF No. 44-6 at 3; ECF No. 44-7 at 5; ECF No. 44-8 at 3. Nor did he physically appear to need immediate medical attention. Id.

/////

/////

## V. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R. Civ. P. 56(c)(1)(A). Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or show that the materials cited by the movant do not establish the absence of a genuine dispute. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not

establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### B. Failure to Protect Claims

Plaintiff's first claim against defendants is based on their failure to protect him from defendant Darling's use of pepper spray on him which plaintiff contends amounted to excessive force. A prison official may be liable under 42 U.S.C. § 1983 if he is aware that a fellow officer is violating a prisoner's constitutional rights but fails to intervene. Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000) ("[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen."); see also Gaudreault v. Municipality of Salem, 923 F.2d, 203, 207 n. 3 (1st Cir. 1990) ("An officer who is present at the scene who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance."). The failure to intervene can support an excessive force claim where the bystander-officers had a realistic opportunity to intervene but failed to do so. Lolli v. County of Orange, 351 F.3d 410, 418 (9th Cir. 2003);

Cunningham, 229 F.3d at 1289; Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995).

**C. Eighth Amendment Deliberate Indifference Standard**

Plaintiff's medical claim which arises under the Eighth Amendment has two elements: proof that plaintiff had a "serious medical need" and that defendants acted with "deliberate indifference" to that need. Estelle v. Gamble, 429 U.S. 97, 105 (1976). A medical need is serious if "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992) (quoting Estelle, 429 U.S. at 104). Deliberate indifference is proved by evidence that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted).

**D. Qualified Immunity**

A court employs a two-step analysis in determining qualified immunity. See Saucier v. Katz, 533 U.S. 194, 200–02 (2001); CarePartners LLC v. Lashway, 545 F.3d 867, 876 n. 6 (9th Cir. 2008). Under the first step, the court determines whether, "taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right." Saucier, 533 U.S. at 201; Bingue v. Prunchak, 512 F.3d 1169, 1173 (9th Cir. 2008). All factual disputes are resolved in favor of the party asserting the injury. See Saucier, 533 U.S. at 201; Ellins v. City of Sierra Madre, 710 F.3d 1049, 1064 (9th Cir. 2013). If the answer to the question is "no," then the inquiry ends and the plaintiff cannot prevail; if the answer is "yes," the court continues the analysis. See Saucier, 533 U.S. at 201; Bingue, 512 F.3d at 1173. Under the second step, the court determines "whether the right was clearly established," and applies an "objective but fact-specific inquiry." Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); see Saucier, 533 U.S. at 202. The critical question is whether "the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates the

right." Saucier, 533 U.S. at 202; Inouye, 504 F.3d at 712. Whether a right is clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201; Bingue, 512 F.3d at 1173. If the officer could have reasonably, but mistakenly, believed that his conduct did not violate a clearly established constitutional right, then the officer will receive qualified immunity. See Saucier, 533 U.S. at 205–06; Johnson v. County of Los Angeles, 340 F.3d 787, 794 (9th Cir. 2003).

### VI. Analysis

As to the failure to protect claim, a law enforcement officer may only be held liable for failing to intercede if he or she had an opportunity to do so. See Cunningham v. Gates, 229 F.3d 1271, 1289-90 (9th Cir. 2000). If a constitutional violation occurs too quickly, there may no realistic opportunity to intercede to prevent the violation. See, e.g., Knapps v. City of Oakland, 647 F.Supp.2d 1129, 1159–60 (N.D. Cal. 2009). To establish a prison official's deliberate indifference in violation of the Eighth Amendment, plaintiffs must show that the official "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.

In this case, the undisputed facts demonstrate that defendants were not at the location of defendant Darling's initial use of force on plaintiff on the exercise yard. Plaintiff fails to produce any admissible evidence that would allow a reasonable juror to find that defendants were aware of Darling's asserted use of excessive force before they approached plaintiff to place him in handcuffs. Considering the facts in the light most favorable to the plaintiff, there is no evidence that defendants knew or should have known that defendant Darling would pepper spray plaintiff or use excessive force against him before plaintiff was placed in flexicuffs. Plaintiff speculates that defendants conspired with Darling to use excessive force against him because "Darling point[ed] at me while talking to the surrounding custody staff including all defendants…."[5] ECF

---

[5] Plaintiff's argument conflates the claim that defendants failed to protect plaintiff from Darling's use of excessive force with an entirely separate claim that all defendants conspired with one another to use excessive force against plaintiff. To the extent that plaintiff seeks to expand the claims in the present action to include a free-standing conspiracy claim, the court emphasizes that

14

No. 58 at 39. However, the relevant question here is whether defendants were subjectively aware of the risk to plaintiff's safety. See Jeffers, 267 F.3d at 914. While "[a] risk can be so obvious that a jury may reasonably infer actual knowledge on the part of the defendants," Hall v. Bennett, 379 F.3d 462, 464 (7th Cir. 2004); see also Farmer v. Brennan, 511 U.S. 825, 842–43 (1994), plaintiff presents no evidence of such an obvious risk here that would permit a jury to reasonably find actual knowledge. Plaintiff has failed to raise a triable issue of fact that defendants knew of and disregarded a substantial risk to plaintiff's safety in violation of the Eighth Amendment. Accordingly, defendants' motion for summary judgment should be granted with respect to the Eighth Amendment failure to protect claim.

The court also recommends granting defendants' motion for summary judgment based on the security camera evidence which demonstrates that they did not have a realistic opportunity to intervene to protect plaintiff based on the rapid succession of events that occurred on the exercise yard. See Scott v. Harris, 550 U.S. 372, 378-79 (2007) (finding that at the summary judgment stage, a court should view the facts in the light depicted by undisputed video evidence because the facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.). At most, the security video demonstrates that there was a 21 second period of time between when plaintiff stood up and when he was pepper sprayed by defendant Darling. Compare C Yard Cam 8 at 10:18:05 with C Yard Cam 8 at 10:18:26. However, during this same time period, other inmates on the yard also stood up and started running towards defendants Pizarro, Camp, and Haring. See C Yard PTZ at 10:18:22-10:18:25; C Yard Cam 8 at 10:18:24-10:18:35.[6] In this case, the security camera footage demonstrates that there is no genuine issue of material fact in dispute related to plaintiff's allegation that defendants failed to protect him. The actions by the other inmates on the exercise yard prevented defendants

---

the screening order found service of the complaint to be appropriate based only on Eighth Amendment claims and not any separate claim based on a conspiracy. See ECF No. 7 at 1-2.

[6] It took defendants longer to walk around the track from the upper basketball court to plaintiff's location on the soccer field than it did for all of the events related to the use of force against plaintiff to occur. Compare C Yard PTZ 7 at 10:16:48-10:18:05 and C Yard Cam 8 at 10:16:47-10:18:05 (showing defendants walk around the exercise track to reach plaintiff's location) with C Yard PTZ 7 at 10:18:05-10:18:40 and C Yard Cam 8 at 10:18:05-10:18:48.

from having a realistic opportunity to prevent Darling's use of pepper spray on plaintiff.

In an effort to counter the rapid timeframe of the events at issue, plaintiff argues that defendants precipitated Darling's second use of force against plaintiff when they used racial insults. However, even if defendants made every comment alleged by plaintiff as we must assume for purposes of ruling on the motion for summary judgment, the use of derogatory names and insults is not enough, without more, to raise a triable issue on a constitutional claim.[7] See, e.g., Austin v. Terhune, 367 F.3d 1167, 1171 (9th Cir. 2004) (noting that "the Eighth Amendment's protections do not necessarily extend to mere verbal sexual harassment"); Freeman v. Arpaio, 125 F.3d 732, 738 (9th Cir. 1997) ("As for being subjected to abusive language directed at [one's] religious and ethnic background, verbal harassment or abuse ... is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983.") (internal quotations omitted) abrogated on other grounds by Shakur v. Schriro, 514 F.3d 878 (9th Cir. 2008). When the defendant's words rise to the level of a death threat, several circuit courts of appeal have found such constitutional claims actionable. See Chandler v. D.C. Dept. of Corr., 145 F.3d 1355, 1360 (D.C. Cir. 1998); Hudspeth v. Figgins, 584 F.2d 1345, 1348 (4th Cir. 1978); Irving v. Dormire, 519 F.3d 441, 449 (8th Cir. 2008). However, plaintiff does not allege that defendants made any threats on his life. Accordingly, defendants' motion for summary judgment should be granted.

With respect to the deliberate indifference to plaintiff's serious medical needs claim, there is no genuine dispute that plaintiff suffered from a serious medical need at the time when defendants approached him on the exercise yard. Based on the security camera evidence as well as plaintiff's medical records, no reasonable juror would believe that plaintiff had a serious medical need at that point. The security camera footage demonstrates that plaintiff was able to stand up without assistance and even run while he alleges that he was having "trouble standing… and [was] constantly hunch[ed] over gasping for air while suffering from severe pain…." ECF No. 58 at ¶ 35. Moreover, the security camera footage does not show plaintiff passing out or fainting at any point. Dr. Moghaddam's review of plaintiff's heart loop recorder also failed to

---

[7] The security camera footage does not resolve the issue of what statements were made by the parties because it does not contain any audio.

show any evidence of a cardiac-related episode of syncope. Thus, the record taken as a whole could not lead a rational trier of fact to find that plaintiff suffered from a serious medical need. See Matsushita, 475 U.S. at 587.

Here, the facts taken in the light most favorable to plaintiff show a delay in obtaining medical attention for plaintiff's injuries. Where a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay caused "significant harm and that Defendants should have known this to be the case." Hallett v. Morgan, 296 F.3d 732, 745–46 (9th Cir. 2002); see McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997). Mere delay of medical treatment, "without more, is insufficient to state a claim of deliberate medical indifference." Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). Here, the medical treatment records from September 28, 2015 demonstrate that the only lasting harm that plaintiff suffered was an abrasion to his left elbow. ECF No. 58 at 82. This is not sufficient to establish any significant harm resulting from the delay in receiving medical attention on September 24, 2015. See Shapley, 766 F.2d at 407. Moreover, the undisputed evidence demonstrates that defendants were not responsible for the delay. The ensuing prison riot and defendants' efforts to restore order to the exercise yard were responsible for the delay in obtaining medical assistance for plaintiff. Defendants Haring and Camp were both escorted from the exercise yard to receive medical treatment themselves and did not have the opportunity to get medical treatment for plaintiff. For all these reasons, the court finds that defendants are entitled to summary judgment on this claim.

Defendants' motion for summary judgment also contends that they are entitled to qualified immunity. Applying the two-step analysis of Saucier v. Katz, 533 U.S. 194, 201 (2001), the court concludes that even taken in the light most favorable to the plaintiff, the defendants' conduct did not violate the Eighth Amendment for the reasons explained above. Accordingly, the undersigned recommends granting defendant's summary judgment on the additional grounds of qualified immunity.

/////

**VII.  Plain Language Summary for Pro Se Party**

Since plaintiff is acting as his own attorney in this case, the court wants to make sure that this order is understood. The following information is meant to explain this order in plain English and is not intended as legal advice.

The court has reviewed the pending motion for summary judgment as well as the affidavits and evidence submitted by the parties and has concluded that the facts of your case are not sufficiently in dispute to warrant a trial against defendants Pizzaro, Camp, and Haring. Your case will proceed on the Eighth Amendment claims against defendant Darling.

You have fourteen days to explain to the court why this is not the correct outcome in your case. If you choose to do this you should label your explanation as "Objections to Magistrate Judge's Findings and Recommendations." The district court judge assigned to your case will review any objections that are filed and will make a final decision on the motion for summary judgment.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. The motion for summary judgment filed by defendants Camp, Haring, and Pizzaro (ECF No. 44) be granted;
2. Plaintiff's Eighth Amendment claims against defendants Camp, Haring, and Pizarro be dismissed with prejudice; and,
3. This case proceed on the Eighth Amendment claims against defendant Darling.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the

/////
/////
/////
/////

objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 14, 2019

/s/ Carolyn K. Delaney
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

12/thom2691.msj.docx